**MONIQUE C. WINKLER**
**JASON H. LEE**
**DAVID ZHOU**
**JASON BUSSEY**
**WILLIAM SALZMANN**
**JONATHAN GRANT**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
44 Montgomery Street, Suite 700
San Francisco, CA 94104
Telephone: (415) 705-2500
Facsimile: (415) 705-2501
Email: busseyja@sec.gov; salzmannw@sec.gov;
grantj@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>Plaintiff,<br><br>v.<br><br>**RANDALL J. MILLER, CHAD J. MILLER, and JEFFREY DE LAVEAGA**<br><br>Defendants. | **COMPLAINT**<br>1:25-cv-02702<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission (the "Commission"), for its complaint against Defendants Randall J. Miller, Chad J. Miller, and Jeffrey De Laveaga, alleges as follows:

**SUMMARY**

1. This matter involves the fraudulent scheme to offer and sell approximately $284 million in municipal bonds, now defaulted, issued for the benefit of Legacy Cares, Inc. ("Legacy Cares"), an Arizona nonprofit corporation in August 2020 and June 2021. Legacy Cares issued the bonds through the Arizona Industrial Development Authority, an Arizona state entity known as a "conduit issuer," which issues municipal bonds for third-party borrowers, such

1

as Legacy Cares. Randall ("Randy") Miller founded and incorporated Legacy Cares for the purpose of issuing the bonds.

2. The bond proceeds were used by Legacy Cares to finance the construction of a multi-sports park and family entertainment center (the "Sports Complex") in Mesa, Arizona. The Sports Complex was operated by Legacy Sports USA, LLC ("Sports USA"), which was founded by Randy Miller.

3. To market the bonds to investors, the underwriter for both bond offerings (the "Underwriter") distributed limited offering memoranda for the 2020 and 2021 bond offerings. Both the 2020 and 2021 offerings were for revenue bonds, which meant that the cash required to pay interest and principal back to the bondholders was to come from the revenue generated by the Sports Complex after it opened in 2022. The limited offering memorandum for the 2020 bond offering (the "2020 Offering Memorandum") included financial projections anticipating revenue that was multiple times the amount needed to cover the payments to investors in the 2020 bonds. These financial projections were prepared at the direction of Randy Miller's son, Chad Miller, with input from Jeffrey De Laveaga, an executive at Sports USA.

4. The financial projections in the 2020 Offering Memorandum were false and misleading. The revenue anticipated in the financial projections was based on indications of interest in the Sports Complex, and was purportedly evidenced by dozens of "letters of intent" that were attached to the 2020 Offering Memorandum and therefore provided to investors. These letters purported to be from various sports clubs, leagues, and other entities expressing the intent to move their events or operations to the Sports Complex. The 2020 Offering Memorandum referenced the letters throughout the document as the basis for the revenue expectations, and included the letters as an attachment.

5. However, the majority of the more than 50 letters of intent were either totally fabricated or materially altered in some fashion, including the forging of signatures, by Randy Miller, Chad Miller, and De Laveaga in the months leading up to the 2020 bond offering. Each

2

Defendant knew or was reckless in not knowing that he was creating false documents, and that the documents would be disseminated to investors.

6. In addition to the fabricated letters of intent, Defendants also, knowingly or recklessly, collaborated to create a set of 25 so-called "pre-contracts," which, like the letters of intent, are referenced throughout the 2020 Offering Memorandum as supporting the revenue expectations. The 2020 Offering Memorandum represented that the pre-contracts constituted "binding" arrangements with Sports USA to use the Sports Complex and pay fees. The pre-contracts were listed in the 2020 Offering Memorandum, and copies of the pre-contracts themselves were provided directly to potential investors prior to the sale of the 2020 bonds through an online investor "data room" hosted by the Underwriter (the "investor data room"). These pre-contracts were purportedly signed by some of the same sports leagues and entities falsely identified as having previously submitted letters of intent. Like the fabricated letters of intent, however, most of the pre-contracts were fake.

7. The limited offering memorandum for the 2021 bond offering (the "2021 Offering Memorandum," and, together with the 2020 Offering Memorandum, the "Offering Memoranda") incorporated the same false projections, letters of intent, and pre-contracts from the 2020 Offering Memorandum.

8. The Sports Complex opened in January 2022 with far fewer events and much lower attendance than had been falsely projected in the Offering Memoranda. The Sports Complex generated less than $28 million in revenue for the year, in contrast to the $96 million year-one revenue projected in the Offering Memoranda.

9. Due to this revenue shortfall, in October 2022, when it came time to begin repayment to the bondholders, Legacy Cares defaulted on both the 2020 and 2021 bonds. Legacy Cares subsequently filed bankruptcy proceedings in May 2023 and the Sports Complex is now owned by a new entity. According to bankruptcy filings, the investors' bankruptcy claim recouped through the bankruptcy less than $2.5 million of the $284 million they had invested.

10. As a result of the conduct described above, Randy Miller, Chad Miller, and De Laveaga each violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)].

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

11. The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

12. The Commission seeks a final judgment against Defendants Randy Miller, Chad Miller, and De Laveaga: (a) permanently enjoining Defendants from violating the federal securities laws and rules that this complaint alleges they have violated; (b) permanently enjoining Defendants from, directly or indirectly, including, but not limited to, through any entity owned or controlled by them, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent Defendants from purchasing or selling securities for their own personal accounts, pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d)(1) and 21(d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and 78u(d)(5)]; (c) ordering Defendants to pay disgorgement with prejudgment interest, pursuant to Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (d) ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), 20(e), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), 77t(e), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

14. Defendants Randy Miller, Chad Miller, and De Laveaga, directly or indirectly, made use of the means and instruments of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

15. Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Acts, transactions, practices, and courses of business that form the basis for the violations alleged in this complaint occurred in this District. For example, certain investors in both the 2020 and 2021 bonds reside in this District and accessed offering documents in this District, and the clearing agency and securities depository that facilitated the transfer of both the 2020 and 2021 bonds is located in this District.

## DEFENDANTS

16. **Randall J. Miller**, age 70, is a resident of Maricopa County, Arizona. At all relevant times, Randy Miller was the founder, Chairman, and Managing Member of Sports USA. He also founded and incorporated Legacy Cares.

17. **Chad J. Miller**, age 40, is a resident of Maricopa County, Arizona. Chad Miller is the son of Randy Miller. At all relevant times, Chad Miller was the CEO of Sports USA.

18. **Jeffrey De Laveaga**, age 55, is a resident of Maricopa County, Arizona. At all relevant times, De Laveaga was the Chief Operating Officer of Sports USA.

## RELATED ENTITIES

19. **Legacy Cares, Inc.** is an Arizona nonprofit corporation and a 501(c)(3) organization formed by Randy Miller to develop, own, and operate sports and family

entertainment facilities. Legacy Cares' principal place of business is in Mesa, Arizona. Legacy Cares was the conduit borrower for the bonds at issue in this complaint. On May 1, 2023, Legacy Cares filed for Chapter 11 bankruptcy and is currently in a liquidation trust.

20. **Legacy Sports USA, LLC** is an Arizona limited liability company and was the manager of the Sports Complex, and each of the Defendants was employed as an officer of Sports USA. Sports USA's principal place of business is in Scottsdale, Arizona. Shortly before Legacy Cares' bankruptcy filing, Sports USA ended its role as the Sports Complex's manager and ceased all operations.

21. **Arizona Industrial Development Authority** (the "Arizona Authority") is a political subdivision of the state of Arizona and an Arizona nonprofit corporation. The Arizona Authority served as the conduit issuer for the 2020 and 2021 bonds.

## FACTS

### I.     Background

22. Prior to 2020, Randy Miller attempted for several years to develop other sports parks concepts by seeking private loans or investor funding. After proposing at least three different locations in the Phoenix area but failing to attract sufficient funds, he began to pursue the use of municipal bonds to finance the construction of the Sports Complex in Mesa, Arizona.

23. In August 2020, the Arizona Authority acted as the conduit issuer for the sale of $250.8 million of economic development revenue bonds for the construction of the Sports Complex. The Arizona Authority acted solely as the conduit issuer with no responsibility for making interest and principal payments on the bonds. According to the 2020 Offering Memorandum, Legacy Cares was responsible for making payments to bondholders and would do so using revenue generated by the Sports Complex.

24. The conduit borrower on the transaction was Legacy Cares. Randy Miller incorporated Legacy Cares as an Arizona non-profit entity so it could qualify as the conduit

borrower for the municipal bond offerings and facilitate a portion of the bonds being issued on a tax-exempt basis as qualified 501(c)(3) bonds.

25. Randy Miller set up Legacy Cares to operate as an independent shell for the sole purpose of issuing the bonds, and Legacy Cares retained Sports USA as a for-profit entity to serve as the Sports Complex's manager. Accordingly, Legacy Cares contracted with Sports USA to oversee the construction of the Sports Complex and manage the facility's subsequent operations. Sports USA, through the Defendants, also had the critical function of providing information about the Sports Complex for use in the Offering Memoranda, including the preparation of the financial projections and supporting documentation provided to investors.

26. For its role, Sports USA was to receive a variety of payments from the Sports Complex, including 5% of all capital expenditures upfront as a "development fee," 7% of all revenue as a "basic fee," 5% of all gross profits as an "incentive fee," and then additional guaranteed monthly "accounting fee[s]" and expense reimbursements.

27. In June 2021, Randy Miller and Chad Miller sought additional funding for the Sports Complex through municipal bonds, and the Arizona Authority ultimately issued an additional $33 million of revenue bonds, also for the construction of the Sports Complex. Once again, according to the 2021 Offering Memorandum, Legacy Cares bore the sole responsibility for making payments to bondholders and would do so using the Sports Complex's revenue.

28. As, respectively, Chairman and Chief Executive Officer of Sports USA, both Randy Miller and Chad Miller had controlling authority over Sports USA at all relevant times. De Laveaga served as Sports USA's Chief Operating Officer and was paid a consulting fee by Sports USA during the relevant period.

29. The Sports Complex was designed to be one of the largest of its kind in the United States, consisting of over 300 acres of indoor and outdoor sports fields, courts, locker rooms, a 10,000-person capacity stadium, office spaces, restaurants, and other entertainment options. The size and cost of the Sports Complex meant that, to be successful, it would need to

be fully utilized for events and activities spanning many different types of sports, such as baseball, football, soccer, volleyball, pickleball, basketball, e-sports, and CrossFit.

## II. Defendants Knowingly or Recklessly Made Materially False and Misleading Statements to Investors in the 2020 Bond Sale.

30. In the 2020 Offering Memorandum, and in other communications with investors, Defendants presented investors with false and misleading projected revenue and other information designed to provide assurances that the Sports Complex would generate the revenue necessary to make timely bond payments. Specifically, Defendants projected that the Sports Complex would generate over $96 million in revenue in its first year of operation. Defendants supported this high revenue number with representations that the venue would be nearly fully booked consistently starting from the opening day.

31. Throughout the 2020 Offering Memorandum, Defendants claimed to support the revenue projections with two independent feasibility studies, as well as detailed spreadsheets that broke down projected revenue by type of sport. The underlying support for the revenue projections supposedly came from more than 50 letters of intent, purportedly from various sports organizations and leagues that had pledged to move events or operations to the Sports Complex.

32. In reality, Sports USA had not generated anywhere near enough interest from sports organizations to support the revenue projections. Rather, Defendants, knowingly or recklessly, fabricated or materially altered the majority of the letters of intent to make it appear that the Sports Complex would be fully committed in its first year of operation. These false documents, in turn, served as the bases for the other false and misleading representations to investors, including the 2020 Offering Memorandum's revenue projections, information in a "peer review" study conducted by an outside consultant that was included in the 2020 Offering Memorandum, and further false so-called "pre-contracts" that purported to be binding agreements with sports entities for the use of the Sports Complex and the payment of fees.

### A.     Fabricated and Altered Letters of Intent

33.     The letters of intent prepared by Defendants were purportedly from a wide array of local, national, and international sporting organizations, including several world-renowned national and international sports institutions. Many of the purported letters expressed an intent to move certain games, leagues, or tournaments to the Sports Complex, while others stated that their organizations would be moving their entire operations there. Certain of the letters included specific attendance and revenue projections for events to take place at the Sports Complex.

34.     In the year leading up to the offering of the 2020 bonds, Defendants knowingly or at least recklessly fabricated or materially altered the majority of the letters of intent. Some of the letters were entirely fake, with the phony documents including, among other things, incorrect letterhead from outdated sources, forged signatures, and incorrect or misspelled signatories. The creation and gathering of the fraudulent letters of intent was a collaborative effort by Defendants, who communicated with each other instructions and shared drafts of fake documents. All three Defendants personally fabricated false documents. In some instances, Randy Miller directed Chad Miller to change the dates on some of the older letters of intent. In others, Chad Miller instructed or coordinated the creation of false letters of intent by De Laveaga and others working at their direction for Sports USA.

35.     For example, one fabricated letter, which falsely described the entity as having committed to move an annual event to the Sport Complex, included a phony letterhead, misidentified the name of the sports organization that purportedly issued the letter, and misspelled the last name of the purported signatory. Another fake letter, which falsely stated that the organization had committed to use the Sports Complex for its events, misidentified the name of the sports organization that purportedly issued the letter, and misspelled the name of the purported signatory of the letter.

36.     Chad Miller then knowingly, or recklessly, provided the false letters of intent to the Underwriter for inclusion as an attachment to the 2020 Offering Memorandum. Chad Miller also provided the false letters of intent to be included in the Underwriter's investor data room.

This investor data room was used by both potential bond investors and other bond participants to evaluate the bonds in the weeks prior to the 2020 bond offering.

### B.     Fabricated Pre-Contracts

37. Chad Miller, and others working at his direction, also fabricated so-called "pre-contracts" representing commitments from sports providers and caused these false documents to be provided to investors in connection with the offering of the 2020 bonds. Randy Miller reviewed the pre-contracts before they were provided to investors.

38. Chad Miller knowingly or recklessly fabricated, and directed the fabrication of, the pre-contracts because the dates on some of the letters of intent were stale and the Underwriter for the bonds had requested that Sports USA obtain additional communications from the purported letter writers that were more current and that reflected a further level of commitment from those entities. In response to this request, Chad Miller, with others at Sports USA working at his direction, fabricated pre-contracts with false signatures from some of the entities that had purportedly signed the letters of intent. The pre-contracts falsely stated that they constituted "binding agreement[s]" between Sports USA and the entities to enter into "formal use agreement[s]" to hold events at the Sports Complex within 90 days of groundbreaking. Randy Miller and Chad Miller knew, or were reckless in not knowing, that the "agreement[s]" represented by the fake pre-contracts were fictitious, and that these documents were created for the purpose of deceiving bond investors. Chad Miller provided the pre-contracts to the Underwriter, and these fake documents were also included in the investor data room in the weeks prior to the offering of the 2020 bonds.

### C.     False and Misleading Projected Revenue

39. The 2020 Offering Memorandum is replete with references to the fabricated letters of intent and pre-contracts to assure investors of potential revenue and the viability of the Sports Complex.

40. Notably, the 2020 Offering Memorandum included projected financial information, including a "Summary Five-Year Pro Forma" financial statement detailing the

expected revenue and expenses for the first five years of the Sports Complex's operation, starting in 2022. According to this pro forma financial statement, the Sports Complex was expected to generate over $96 million in revenue in 2022, which was multiple times the amount owed in payments to bondholders that year. The pro forma financial statement was prepared at the direction of Chad Miller in the weeks prior to the offering of the 2020 bonds. Chad Miller and De Laveaga then reviewed and approved the pro forma statement before providing it to the Underwriter for inclusion in the 2020 Offering Memorandum.

41. As Defendants knew, or were reckless in not knowing, the projected revenue in the pro forma financial statement was false and misleading because it was based on the false letters of intent and pre-contracts.

**D.     False and Misleading "Peer Review & Impact Analysis" Relying on the Fabricated Letters of Intent**

42. Chad Miller also knowingly or recklessly provided the false financial projections and fake letters of intent to an unknowing outside consultant (the "Peer Review Consultant"), which used that information to put together a report that was generally supportive of Sports USA's misleading revenue projections. That report was attached to the 2020 Offering Memorandum.

43. In or around 2016, Randy Miller and Sports USA engaged an outside consultant (the "Feasibility Consultant") to conduct a feasibility study of one of Sports USA's earlier sports-park proposals, which would have been located in Phoenix rather than Mesa. The Feasibility Consultant estimated that the potential first-year annual revenue for that project ranged from $29 million up to, with caveats, $38 million.

44. At the Underwriter's suggestion, Chad Miller engaged a peer-review consultant to conduct a "Peer Review & Impact Analysis" (the "peer review") which examined the methodology of the earlier feasibility study, but updated it by applying the more recent revenue projections specifically relating to the Sports Complex's Mesa location. As explained in detail above, those projections, which were directed and approved by Chad Miller and De Laveaga,

11

were based on the false letters of intent, which were themselves also provided to the Peer Review Consultant through the investor data room. On its face, the peer review made clear that its calculations were dependent on the Peer Review Consultant's assumption that "all" of the letters of intent were accurate.

45. The 2020 Offering Memorandum attached the peer review as an appendix. In it, the Peer Review Consultant concluded that the Sports Complex would generate approximately $84 million in first-year revenue. Although this amount was lower than the corresponding figure in Sports USA's pro forma financial statement, which estimated $96 million of first-year revenue, it was still multiple times more than the amount necessary to meet Legacy Cares' bond payment obligations to investors. As Defendants knew, or were reckless in not knowing, the peer review presented to investors in the 2020 Offering Memorandum was based on materially false and misleading revenue projections and false letters of intent.

  **E.**  **False Statements Made on Bond Investor Webinar**

46. In July 2020, a few weeks before the offering of the 2020 bonds, Chad Miller and De Laveaga participated in a webinar hosted by the Underwriter and attended by potential investors. In this webinar, Chad Miller falsely stated that the entire Sports Complex was pre-sold to be "over 90% occupancy" by day one of opening. He further misleadingly stated that the projected revenue and occupancy rate were supported by the letters of intent—the same documents that he had helped to fabricate and alter. Similarly, De Laveaga misleadingly told investors in the webinar that the Sports Complex would be sold out before it even opened its doors.

47. Both Chad Miller and De Laveaga knew, or were reckless in not knowing, that their statements were false and misleading, and that the statements were based on the false revenue projections and false documents that Defendants had created.

### III. The 2021 Offering Memorandum Incorporated the Same False Statements from the 2020 Offering Memorandum.

48. The second offering occurred in June 2021 when the Arizona Authority issued $33 million of additional bonds, also to be used to construct the Sports Complex. The 2021 Offering Memorandum incorporated the entire 2020 Offering Memorandum, including the false and misleading revenue projections, misleading peer review, the fabricated letters of intent, and descriptions of the fabricated pre-contracts. Accordingly, the false and misleading statements described above regarding the 2020 bonds apply equally to the 2021 bonds.

### IV. Defendants Acted Knowingly or Recklessly to Deceive Bond Investors.

49. The scheme to offer and sell the bonds through the use of false and misleading financial projections, the false letters of intent and pre-contracts, and the misleading peer review, was conducted knowingly or recklessly by Defendants. Notably, Defendants acted with scienter in fabricating and altering numerous letters of intent and pre-contracts, which they knew, or were reckless in not knowing, would be provided to potential investors. Defendants further knew, or were reckless in not knowing, that the financial projections that they created for the offerings were false and misleading because they were based on false letters of intent and false pre-contracts. Defendants also knew, or were reckless in not knowing, that the peer review was based on the fake letters of intent. In addition, Chad Miller and De Laveaga knew, or were reckless in not knowing, that the statements they made during the investor webinar were based on false projections and false documents.

50. Defendants' misrepresentations were material to a reasonable investor, as well as actual investors, in the 2020 bonds and 2021 bonds. The revenue projections and peer review in the Offering Memoranda were important to investors when deciding whether to purchase the bonds because the bonds were revenue bonds and, as a consequence, interest and principal payments would be made from the Sports Complex's revenue. The letters of intent and pre-contracts, which were the underlying basis for the revenue projections and peer review, were also important to investors.

### V.     The Proposed Defendants Personally Profited from the Fraud.

51.    Each of the Defendants personally profited from his fraudulent conduct. Sports USA's primary source of revenue was the bond proceeds obtained by Legacy Cares. Each of the Defendants received substantial payments from the ill-gotten gains obtained through their false and misleading statements and fraudulent scheme. For example, Chad Miller paid himself through Sports USA more than approximately $30,000 per month after the fraudulent 2020 bond offering. Sports USA also paid De Laveaga a consulting fee of more than approximately $20,000 after the 2020 bond offering. Additionally, almost immediately after the 2020 bond offering, Randy Miller received approximately $230,000 from the bond proceeds that Legacy Cares transferred to Sports USA.

### VI.    Legacy Cares Defaulted on the Bonds and Filed Bankruptcy Proceedings.

52.    The Sports Complex opened in January 2022 to a fraction of the demand promised by Defendants. The Sports Complex reported first-year revenue of under $28 million for 2022, well short of the $96 million in revenue falsely projected in the Offering Memoranda.

53.    As a consequence, the bonds quickly failed. Legacy Cares was unable to make interest and principal payments to bondholders, and, in October 2022, the bond trustee declared the 2020 bonds and 2021 bonds to be in default. Attempts by Legacy Cares, Randy Miller, and Chad Miller to refinance the bonds were unsuccessful.

54.    As a result of the severe revenue shortfall, Legacy Cares filed Chapter 11 bankruptcy in May 2023 and was put in a liquidation trust. According to bankruptcy filings, the Sports Complex was ultimately sold for less than $26 million to a new company which now operates it. Due to the disappointing revenue, as well as a large number of construction and contractor liens burdening the Sports Complex, the bond investors' bankruptcy claim recouped less than $2.5 million of the $284 million invested.

55.    Sports USA is now defunct, and all services for the Sports Complex previously provided by Sports USA have been taken over by another entity.

## FIRST CLAIM FOR RELIEF

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

*Against All Defendants*

56. The Commission realleges and incorporates by reference paragraphs 1 through 55.

57. By engaging in the conduct described above, Defendants Randy Miller, Chad Miller, and De Laveaga, directly or indirectly, in connection with the purchase or sale of securities, by use of means or instrumentalities of interstate commerce, or of the mails:

   a. Employed devices, schemes, or artifices to defraud;

   b. Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

   c. Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers of securities.

58. By reason of the foregoing, Defendants Randy Miller, Chad Miller, and De Laveaga violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

*Violations of Section 17(a) of the Securities Act*

*Against All Defendants*

59. The Commission realleges and incorporates by reference paragraphs 1 through 55.

60. By engaging in the conduct described above, Defendants Randy Miller, Chad Miller, and De Laveaga, directly or indirectly, in the offer or sale of securities, by use of the

means of instruments of transportation or communication in interstate commerce or by use of the mails:

      a. employed devices, schemes, or artifices to defraud;

      b. obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

      c. engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

61. By reason of the foregoing, Defendants Randy Miller, Chad Miller, and De Laveaga violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

I.

Permanently enjoining Defendants from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

II.

Permanently restraining and enjoining Defendants from directly or indirectly, including, but not limited to, through any entity owned or controlled by them, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent Defendants from purchasing or selling securities for their own personal accounts, pursuant to

Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d)(1) and 21(d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and 78u(d)(5)];

III.

Requiring Defendants to disgorge all ill-gotten gains received as a result of their unlawful conduct plus prejudgment interest thereon, pursuant to Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

IV.

Requiring Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

V.

Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

VI.

Granting such other and further relief as this Court may determine to be just and necessary.

**JURY DEMAND**

The Commission demands a trial by jury.

Dated: April 1, 2025

Respectfully submitted,

*/s/ William T. Salzmann*
William T. Salzmann
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION